VIRGINIA ELECTRIC AND POWER COMPANY

v.

STATE CORPORATION COMMISSION, ET AL.

March 2, 1979.

Record No. 781048.

Present: All the Justices.

*Guy T. Tripp, III (Evans B. Brasfield; Edgar M. Roach, Jr.; Moira K. Donoghue; Hunton & Williams,* on briefs), for appellant.

*John F. Kay, Jr.; Richard D. Rogers, Jr. (William G. McClure, III; Lewis S. Minter; Edward L. Flippen; A. Lynn Ivey, III; Mays, Valentine, Davenport & Moore,* on briefs), for appellees.

COCHRAN, J., delivered the opinion of the Court.

By opinion and order entered March 27, 1978 (Shannon, Commissioner, dissenting), the State Corporation Commission cancelled a tariff schedule filed by Virginia Electric and Power Company (Vepco or the Company) pursuant to which the Company was offering outdoor lighting service. The Commission directed Vepco to file within 180 days a proposal to eliminate the ratemaking treatment afforded such service under the tariff schedule. The opinion and order was modified by order entered March 31, 1978, to permit Vepco to continue service to existing facilities installed pursuant to said tariff schedule at the rates therein prescribed, pending the approval of appropriate tariff provisions filed by Vepco. In this appeal, the first question for decision is whether the Commission had the power to enter the order of March 27, 1978, which had the effect of eliminating outdoor lighting service from

Vepco's rate-making structure. If so, the next question is whether this power was properly exercised.

This proceeding was initiated in 1973 when the Virginia Chapter, National Electrical Contractors Association, Incorporated (excluding the Roanoke Division) and Curtis L. Williams (collectively, NECA), filed an application seeking to have the Commission prohibit Vepco from furnishing outdoor lighting service pursuant to its tariff designated as Schedule No. 26. Subsequently, NECA and Vepco entered into a written stipulation of the pertinent facts and the question to be submitted to the Commission.

Members of NECA are engaged in the business of electrical contracting in Vepco's service area. They perform a major portion of the commercial and industrial electrical contracting work in that area, and some NECA members sell, install, and maintain outdoor lighting facilities for customers.

In their installation and maintenance of outdoor lighting facilities, NECA members are required to use licensed electricians, to make installations in accordance with standards prescribed by the National Electrical Safety Code, and to have their work inspected by local authorities. Members must also obtain local electrical permits and pay the prescribed fees before undertaking any electrical installation. They are not required to install outdoor lighting facilities upon request, and their charges are not subject to regulation. When a NECA member installs outdoor lighting facilities, the customer becomes the owner of the facilities and must pay taxes on them and arrange for their maintenance and repair. Electricity required for outdoor lighting facilities installed by NECA members must be purchased from Vepco, and its cost is based upon the metered usage at the prescribed tariff rate for the applicable customer classification.

Vepco, on the other hand, contracts with residential, commercial and industrial customers to install, maintain and operate "watchlite, area and roadway lighting service on the private property of such customers" under Schedule No. 26. Customers are charged an unmetered, fixed monthly rate for the service, based upon the lumens of each lamp provided by Vepco. The facilities, including lines, poles, fixtures and lamps, are installed either by Vepco employees or by contract crews working under Vepco's supervision, and remain the property of the Company. Vepco employees are not required to be licensed electricians, although they are trained and tested by Vepco. The Company, while not required to follow the National Electrical Safety Code, does

comply with the provisions of that Code, but it is not required to obtain electrical permits or pay any fees to local authorities and it does not do so.

To the extent the cost of installing the facilities is less than four times the anticipated continuing annual revenue to Vepco therefrom, the installation is performed at Vepco's expense, and the cost of installation is capitalized by Vepco as a part of its rate base upon which it is permitted to earn a return. The expense of warehousing materials used for installation is also included in the rate base. For the year 1974, Vepco's rate of return on outdoor lighting service was 6.88%; Vepco's rate of return on residential service for the same year was 6.83%. The cost of maintaining and repairing the facilities is included as an operating expense for rate-making purposes.

As of December 31, 1973, Vepco provided outdoor lighting service under Schedule No.26 to 46,056 customers in Virginia. The allocated portion of Vepco's rate base to provide outdoor lighting service was $9,551,313 for 1970, and $15,217,036 for 1973. The gross revenue received by the Company for the service for 1973 was $3,627,917.

Thus, it appears as NECA argues, that NECA members can provide for their customers all that is required for outdoor lighting service except the electric energy to activate the lighting equipment. It also appears, however, as Vepco maintains, that Vepco provides a complete lighting service, including fixtures, lamps and electric energy. Hence, because of the difference in the product that is offered by each, there is limited, but not total competition between NECA members and Vepco.

NECA and Vepco stipulated that the question to be decided by the Commission was whether, on various specified grounds, the practices of Vepco in rendering outdoor lighting service under Schedule No. 26 should be prohibited. The Commission, in its March 27, 1978, opinion and order, however, concluded that the appropriate question was whether Vepco, *in rendering outdoor lighting service under Schedule No. 26, should be accorded cost of service entitlement for the cost of providing the service.* Ruling that Vepco should cease to provide such service pursuant to tariff provisions, the Commission expressly declined to decide whether Vepco "should" continue to provide outdoor lighting service inde-

pendent of cost of service entitlement.[1]

The majority opinion held that only utility property used or useful for the purpose of rendering the public service obligation of the utility is to be included in its rate base, that identification of the property to be included is a factual determination for the Commission, and that outdoor lighting service property should not be so included. The majority was of opinion that when an electric utility engages in a competitive business that does not have "long-run natural monopoly" tendencies, the cost of doing such business should not receive rate of return entitlement. In finding that Vepco was engaged in competition with NECA members in the outdoor lighting business, the majority gave "weight to the fact that Vepco is not required to perform this service as part of its public service obligation."

In his dissenting opinion, Commissioner Shannon relied upon the broad definition of "service" found in Code § 56-233[2], and upon the long-standing administrative practice, beginning in 1939, under which Vepco has offered the type of service which the majority has ordered to be cancelled as a tariff service. He noted that Schedule No. 26 and prior similar tariffs filed by Vepco and similar tariffs filed by other electric utilities and cooperatives had never been questioned previously by members of the present Commission or their predecessors. Expressing concern over what he anticipated would be the adverse effect of the majority decision on many thousands of Virginians who could not afford to pay the capital costs of installation, Commissioner Shannon was of opinion that "providing security outdoor lighting on customers' property is a lawful utility service offered in the public interest."

Vepco contends that the Commission, by its order, has declined

---

[1]Under Virginia Code § 13.1-50, a public service corporation may, under some circumstances, perform nonpublic service business. The relevant portion of § 13.1-50 reads as follows:

No corporation organized under this Act to conduct the business of a public service company shall have general business powers in this State. Corporations organized under this Act to conduct the business of a public service company may, however, conduct in this State other public service business or nonpublic service business so far as may be related to or incidental to its stated business as a public service company. . . .

[2]The term "service" is used in this chapter in its broadest and most inclusive sense and includes not only the use of accomodations afforded consumers or patrons, but also any product or commodity furnished by any public utility and equipment, apparatus, appliances and facilities devoted to the purposes in which such public utility is engaged and to the use and accommodation of the public.

to perform the duty imposed upon it by the Constitution and statutes of Virginia to regulate outdoor lighting service such as that provided under Schedule No. 26. Such service, says Vepco, has been offered, subject to Commission regulation, by it and other utility companies for many years and Vepco rate schedules for the service have been filed with and approved by the Commission since 1939.

The jurisdiction of the Commission to regulate the rates of electric companies was established not by the 1902 Constitution but by Chapter 340 of the 1914 Acts of the General Assembly[3]. *See Commonwealth v. VEPCO*, 214 Va. 457, 460, 201 S.E.2d 771, 773 (1974). With amendments not relevant to this case, the provisions of this Chapter were incorporated into the Code of 1919 and succeeding Codes. *See e.g.*, Code of 1919 §§ 4064-4073.

Under the provisions of Article IX § 2 of the 1971 Constitution,[4] Code § 12.1-12[5], and Code § 56-35[6] the Commission is required to regulate public utilities. Code § 56-232 defines "public utility" in substantially the same terms as in Chapter 340 of the 1914 Acts of Assembly to include companies furnishing "light" to or for the public. However, the Utility Facilities Act, enacted in 1950, under which a certificate of convenience and necessity is required as a prerequisite for exclusive public utility service in a specified area, defines a public utility subject to the Act to include "any company

---

[3][1.(b)]. It shall be the public duty of every public utility to furnish reasonably adequate service and facilities at reasonable and just rates to any person, firm or corporation along its lines desiring same and not engaged in a similiar business. . . .

2. Public utility defined.—The term "public utility" as used in this act shall mean and embrace every corporation, other than a municipality . . . that now or hereafter may own, operate, manage, or control any plant or equipment . . . for the production, transmission, delivery, or furnishing of heat, light, water or power either directly or indirectly to or for the public.

3. Service defined. . . .[The term "service" is defined in language identical to that now found in Code § 56-233 and set forth in footnote 2 *supra*.]

[4]Subject to such criteria and other requirements as may be prescribed by law, the Commission shall have the power and be charged with the duty of regulating the rates, charges, and services . . . of . . . electric companies.

[5]Subject to such criteria and other requirements as may be prescribed by law, the Commission shall have the power and be charged with the duty of regulating the rates, charges, services, and facilities of all public service companies as defined in § 56-1 of this Code. [Under § 56-1 "electric light companies" are included in the definition of public service companies.]

[6]The Commission shall have the power, and be charged with the duty, of supervising, regulating and controlling all public service companies . . . in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses therein by such companies.

which owns or operates facilities . . . for the generation, transmission or distribution of electric energy for sale . . . ." Code § 56-265.1. The Utility Facilities Act does not include a company furnishing "light" within its definition of a public utility. This lack of uniformity in statutory definitions raises questions about the functions of and the difference between "light" and "electric" companies.

The articles of incorporation of Vepco, set forth in the majority opinion of the Commission, state the corporate purposes in broad general language.[7] Vepco says that it is authorized to offer outdoor lighting service by the language of Code § 56-232 defining a public utility as a company furnishing "light" to the public. Vepco believes that the General Assembly was aware of the outdoor lighting service offered by utilities, and intended in § 56-232 and its predecessors to approve of and provide for the regulation of this service. Vepco answers the assertion that, under this theory, it could also offer complete indoor lighting service only by saying that it has offered outdoor service but has never offered indoor service.

The first schedules filed by Vepco, beginning in 1939, were entitled "Street and Highway Lighting Service Rate" and made available to "individuals, companies and corporations . . . series street lighting type of service on streets, alleys and private property." Schedules were superseded from time to time by revised schedules increasing the power and variety of the lamps furnished by the Company and increasing the rates charged for the service. In 1939, lamps varying from 1,000 to 6,000 lumens were offered; in 1976, mercury vapor lamps varying from 3,300 to 53,000 lumens, and sodium vapor lamps varying from 5,000 to 127,000 lumens were available. The schedule filed in 1961 was entitled "Outdoor Lighting Service" and subsequent schedules, including Schedule No. 26, filed effective December 15, 1977, have been designated in the same manner. The schedules filed in 1954 and 1957 were expressly made "applicable to any customer for street lighting service." Beginning in 1961, however, the schedules were

---

[7]To do the business of a general electric, power and lighting company. . . .

* * *

. . . [To] have and enjoy all of the rights, powers and privileges granted to, or conferred upon railway, light and power companies by the laws of the State of Virginia. . . .

made applicable to any customer for "outdoor lighting service" except where installations were prevented "by any public authority having jurisdiction." By subsequent revision, the exception was broadened to include the language "or are otherwise unlawful."

Counsel for NECA and counsel for the Commission argue that the words "light" and "power" as used in Code §§ 56-1 and 56-232 are generic terms, referring to the end products of the energy purchased by the customer, and that these words in no way require the Commission to regulate outdoor lighting service. There is nothing in the record to show whether street and highway lighting was being sold by electric companies in 1914, and if so, whether the legislative intent in approving Chapter 340 of the 1914 Acts was to include such lighting within the regulatory jurisdiction of the Commission. Nor is there anything in the record to show any legislative intent to expand the meaning of street and highway lighting to include installation, operation and maintenance of outdoor lighting facilities on private property.

In light of the Commission's decision, however, it is unnecessary for us to resolve those questions. The rationale of the Commission opinion is that, assuming that Vepco could offer the outdoor lighting service described in Schedule No. 26, the Commission had to make the factual determination whether the service was offered pursuant to the public utility function of the Company. The Commission held that it could not compel Vepco to offer the outdoor lighting service, and it found that the service offered under Schedule No. 26 was not devoted to the use and accommodation of the public. We believe that the Commission had the power to make this determination, regardless of the wisdom of the decision. Under Code § 56-35 the Commission has regulatory powers in respect to matters relating to the performance of the public duties of a utility. The plain implication is that the Commission must determine what the public duties of a utility comprise. Moreover, in determining the rate base upon which the utility is entitled to a reasonable rate of return, the Commission must decide which facilities are used and useful in providing service to the public. *See Commonwealth* v. *Vepco*, 211 Va. 758, 760, 180 S.E.2d 675, 677 (1971). If the determination is made that the service in question is devoted to the public use, then the broad provisions of Code § 56-233 operate to include within the meaning of "service" all "equipment, apparatus, appliances and facilities" that are used. But if the determination is made that the service is not devoted to the public use, the all-inclusive language of § 56-233 is irrelevant.

We do not agree with Vepco's contention that the Commission

order represented, in effect, an abdication of its responsibility for regulating the Company's operations. Rather, we view the Commission's action as a determination that the part of Vepco's operation devoted to the furnishing of outdoor lighting was not a part of its public service and therefore was no longer eligible for rate of return entitlement. Implicit in the Commission's ruling is the conclusion that under Schedule No. 26 Vepco was merging its nonpublic function of providing the physical assets required for outdoor lighting with its public function of selling electric energy under its state-sanctioned monopoly, thereby eliminating or substantially reducing all competition for the nonpublic operation. Thus, in the view of the majority of the Commission, Vepco's investment in only that part of its operation requiring, in the public interest, the protection and regulation incident to a state-sanctioned monopoly will be included in its jurisdictional rate base. All other parts of its business, wherever they are permitted, that are subject to the unsheltered and unregulated pressures of competition in the market place under our free enterprise system, will be denied rate of return entitlement.

We have held that in matters pertaining to the establishment of rates, the Commission exercises a legislative function, and has the power not only to change a rate but "to change, under certain conditions, any part of a filed schedule, rate, rule or regulation that in any manner affects the rates . . . ." *Newport News* v. *Telephone Company*, 198 Va. 645, 648, 96 S.E.2d 145,148 (1957), citing *Norfolk* v. *Virginia Electric, Etc., Co.*, 197 Va. 505, 516, 90 S.E.2d 140, 148 (1955). The Commission's decision in this case, while not made in a rate-making proceeding, affects Vepco's jurisdictional rate base. Under the Commission's order, the cost of providing and maintaining outdoor lighting service cannot be included in Vepco's rate base. We hold, therefore, that the Commission was acting in its legislative capacity in cancelling a filed schedule, and that its decision is presumed to be reasonable and correct. *See Howell* v. *C&P Tel. Co. of Virginia*, 215 Va. 549, 557, 211 S.E.2d 265, 270-271, *appeal dismissed*, 423 U.S. 805 (1975).

We cannot say that the Commission's decision is unreasonable as a matter of law. Accordingly, we will affirm the order of March 27, 1978.

*Affirmed.*