# CENTRAL VIRGINIA ELECTRIC COOPERATIVE

## v.

# STATE CORPORATION COMMISSION

January 16, 1981.

Record No. 800165.

Present: All the Justices.

*Evans B. Brasfield (Richard D. Gary; Kenneth W. Farrar; Hunton & Williams; Farrar & Serkes,* on briefs), for appellant.

*A. Lynn Ivey, III (Lewis S. Minter; Donald G. Owens,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this appeal of right, Central Virginia Electric Cooperative (CVEC) attacks a decision of the State Corporation Commission which revoked and modified the cooperative's line extension policy.

CVEC is a public utility under the Electric Cooperatives Act, Code §§ 56-209 to -231. As of January 1, 1978, the cooperative furnished electric service to approximately 15,000 Virginia customers in parts of 14 counties. The western boundary of CVEC's territory adjoins the Blue Ridge Parkway.

Pursuant to statute, the cooperative had filed tariff schedules with the Commission. They included a section entitled "Rural Extension Policy and Charges." That section prescribed the conditions for extending electric power distribution facilities to new residential customers of CVEC. The basic issue before the Commission was the reasonableness of the cooperative's line extension charge.

This proceeding commenced in October 1978 when the Commission issued a Rule against CVEC as defendant requiring it to appear before the Commission and show cause "why the Commission should not find its present Line Extension Policy unreasonable and why it should not be required by further order of the Commission to change its present Line Extension Policy to give new customers more reasonable access to the facilities of the defendant." Attached and made a part of the Rule was a November 1977 report of the Commission's Staff setting forth the nature of the complaint giving rise to issuance of the Rule.

A portion of the report provided:

> Whereas the fundamental aim of most Cooperatives is to extend facilities at no charge to the customer or at least spread the cost of extension over a five year period through the imposition of a minimum monthly charge, CVEC requires the applicant to provide up-front payment to cover the excess cost. Based upon the consumer inquiries received by the Staff, these up-front payment amounts are substantial ($1,000 to over $20,000) and in many instances prohibitive for the customer. As a result, citizens have purchased land and are unable to construct a home due to the extremely high cost of extending electric service and, in a number of instances, citizens have homes under construction or completed but are unable to reside in them because they don't have enough money to pay for an electric service extension.

Included as a part of the Staff Report was a 1975 Staff Memorandum which reviewed the line extension policies of the 15 cooperatives certificated to operate in Virginia. The Memorandum summarized the charges to an applicant for "single phase, overhead service to dwellings occupied as a residence on a year round basis." The

Report concluded that "CVEC had the most restrictive (severe) line extension policy as relates to the costs incurred by the applicant." The Report set forth the Staff's opinion that CVEC's policy was unreasonable and should be modified.

CVEC's policy then in effect provided that it would incur the cost for extension of service up to an amount equal to one and one-half times the cooperative's average annual investment per customer or 84 times the anticipated monthly revenue, whichever was lesser. Beyond those limits CVEC charged the applicant 80 percent of the excess cost.

During hearings held in December of 1978 and March of 1979, Commission counsel, on behalf of the Staff, presented testimony of 11 members of the public and one Staff witness. The public witnesses had dealt with CVEC in the counties of Goochland, Fluvanna, Albemarle and Nelson. Testifying for CVEC were its Manager, its Chief Engineer and a financial, economic and rate analyst.

The technical evidence to support the Staff's conclusion that CVEC's line extension charges were unreasonable came from James R. Wittine, Director of the Commission's Division of Energy Regulation. Wittine noted that two consumer complaint surveys conducted during the period 1973-1977 showed an increase in the rate of complaints against the cooperative per 100,000 customers since 1973. At the end of 1977, CVEC had the greatest complaint rate of the 15 Virginia electric cooperatives with about 40 percent of the grievances directed to its line extension policy.

Wittine stated that the Staff had made three recent surveys of line extension charges of the 15 cooperatives; CVEC's requirements were the most restrictive of the group. For example, he testified many would provide service at no charge while some would pay for the first 1000 feet of line with the cost for the excess being billed directly to the customer or through a minimum monthly guarantee. Wittine stated the recent trend among the cooperatives "has been towards a relaxation of the line extension policies" but that CVEC's continues to be "the most severe."

Wittine reviewed the current and long-standing policy of the Rural Electrification Administration (REA) for extension of electric service to rural users. That policy provides that extension be made "without payment by such persons of any contribution in aid of construction."

In order to illustrate the specific amount of advance payment, or "up-front charges," which new service applicants might face from the respective cooperatives, Wittine presented a hypothetical case based on furnishing residential electric service requiring a 3000-foot ex-

tension of line, one-half being over private property. In the example, CVEC's charges to the customer for the construction exceeded all other Virginia cooperatives except one. Wittine conceded, however, the results of the hypothetical could be changed by altering one of the many assumptions, thereby improving CVEC's ranking.

The public witnesses all expressed dissatisfaction with CVEC's line extension policy. Illustrative of this body of complaints was the testimony of Royce A. Burruss, who bought an unimproved residential lot in 1973 or 1974 in a subdivision in Goochland County. Burruss said he had intended to build a house on the property during 1976. At that time, CVEC's representative verbally stated the cost "to have power lines put to [the] property" would have been from $5500 to $7500. Burruss testified the anticipated cost of electric service prohibited him from going ahead with his plans. At the time of the hearing, he had not begun construction on the lot, saying, "I am just having to sit on it."

CVEC's Chief Engineer reviewed the cooperative's position on the specific complaints made by the public witnesses. He described the manner in which new service applications were processed and explained why the cooperative's estimate of charges was high.

The cooperative's Manager related the many factors that affect establishment of a line extension policy and the cost associated with it. He noted CVEC has a customer density of five and one-half consumers to the mile and, in many locations within its certificated territory, as much as four miles of line must be built to serve the customer. He said that prudent business judgment dictated there must be "some limitation" on the amount of the cooperative's investment for serving applicants. He noted that an "extension policy needs to be tailored to suit the individual character of the service territory," a reference to the fact that much of CVEC's territory is "up against the Blue Ridge Mountains."

The analyst presented by CVEC testified that a limit should be placed on the amount of investment CVEC should be required to provide to serve a single new residential customer. He testified that if a low-density cooperative like CVEC was forced to serve all applicants under a "free extensions" policy, the cooperative's "short run financial condition will be impaired" and "rates will ultimately go up for the rest of the present consumers." Thus, he said, "all current consumers will be forced to subsidize a few consumers who would like to build on top of a mountain or in an area remote from existing cooperative facilities." The analyst also compared the line extension policies of the 15 Virginia cooperatives and opined that a number of the cooperatives

making no extension charge "have a poorer than average financial condition."

In October of 1979, the Commission entered the order appealed from. In its findings, the Commission noted that in assessing the reasonableness of any line extension policy a number of factors are important, but that two primary objectives must be considered: (1) "The policy should not result in unreasonable one-time charges to new customers" and (2) "The policy should not cause significant capital expenditures by the cooperative which result in deterioration in financial condition and an unreasonable increase in the level of rates to all customers." The Commission determined that CVEC's existing policy was "unreasonably severe with respect to the payment for installation which is required" and that such policy should be modified. The Commission ordered the cooperative to submit a new policy to become effective December 1, 1979, for extending electric service to new residential customers, according to the following criteria:

a. Central Virginia Electric Cooperative shall invest up to 4 times the average annual investment without charge to the customer for such line extension.
b. For installation requiring investment in excess of 4 times the average annual investments a monthly minimum charge, not to exceed 1½ percent per month, on that portion of investment in excess of 4 times may be established.
c. That the monthly minimum of (b) above shall not extend beyond a period of five years.
d. That if additional customers are added to the line extension within the first five years, the monthly minimum shall be recomputed as if it were a new extension, but in no event shall the minimum to the existing customers be increased nor shall the period for applying the monthly minimum be extended for existing customers.

In commenting on the new policy, the Commission said there was no evidence that a substantial reduction in the "one-time charge" to new customers affected by the old policy would materially alter CVEC's financial state or materially increase rates to present customers. The Commission noted that the old policy, however, materially and adversely affected some landowners to the extent they could not obtain electric service. The Commission also pointed out that the amended policy authorized some contribution by the customer for connection costs when unreasonably high expenditures were necessary.

At the outset, we must decide the nature of the proceeding below in order to fix the standard of appellate review. CVEC argues the matter was judicial, while the Commission urges it was legislative. We agree with the Commission.

Even though the Commission's investigation was not made in a pure rate-making setting, the proceeding contemplated changing a filed schedule that affected rates. Thus, the Commission was acting in this case in its legislative capacity in revoking and modifying CVEC's existing line extension policy. *Virginia Electric and Power Co.* v. *State Corporation Commission,* 219 Va. 894, 902, 252 S.E.2d 333, 338-39 (1979). In such a situation, there is a reasonably wide area in which legislative discretion may be exercised and we must regard the actions of the Commission as prima facie just, reasonable and correct. Consequently, unless the Commission has abused the discretion vested by statutory and constitutional provisions, we cannot disturb its findings. *Washington Holding Corp.* v. *County Utilities Corp.,* 207 Va. 729, 734, 152 S.E.2d 50, 54 (1967).

Under the Constitution, the Commission has the duty to regulate the rates, charges, services and facilities of electric companies in Virginia. Va. Const. art IX, § 2. Pursuant to Code § 56-35, the Commission has the duty of supervising, regulating and controlling all public service companies doing business in the State and of "correcting abuses therein by such companies." Under § 56-235, the Commission has the power to change rates, charges and schedules found to be unjust or unreasonable.

Operating under the foregoing principles, the Commission, as noted in its written opinion, recognized that the basic legal consideration in evaluating line extension charges is one of reasonableness; that is, the policy should not place an unreasonable burden on the customers or upon the cooperative as a whole.

CVEC does not disagree with the Commission's summary of the applicable law, but contends, relying on isolated statements in the Commission's opinion, that the Commission erroneously decided the cooperative was required to carry the burden of proof on reasonableness. Rather, CVEC says, the Commission Staff had the burden, which it failed to discharge, to prove "that the revised line extension policy prescribed by the Commission would not result in an unreasonable burden on the Cooperative and its customers." We think the Commission properly placed the burden of proof on the Staff, and that the Staff's evidence sustained the burden.

In this investigative proceeding, the Commission used the Rule method to initiate the matter. Plainly delineated in the Rule were the

issues to be considered and upon which the Staff had the burden of proof. The first inquiry was whether CVEC's "present Line Extension Policy [is] unreasonable." The second inquiry was whether the cooperative's existing policy should be changed "to give new customers more reasonable access to the facilities" of CVEC. Manifestly, the answer to the latter flows directly from the response to the former. In shouldering its burden, the Staff established a prima facie case on both counts by presenting evidence to demonstrate the adverse effect upon new customers of CVEC's excessive "up-front" charges for construction of distribution facilities. Such a conclusion was based upon the frequency and specifics of consumer complaints, upon a review and analysis of other cooperatives' line extension procedures, upon the free extension policy of the REA, and upon the apparent minimal annual expense CVEC would have incurred in the past with no "up-front" assessment (only $4000 in 1978). That proof placed the burden of going forward with the evidence on those issues upon CVEC. Specifically, the cooperative then had the obligation, first, to meet the evidence of policy unreasonableness with evidence of reasonableness and, second, to go forward and show that a change in the existing policy would adversely affect the utility and its customers. The Commission, as it had a right to do in the exercise of legislative discretion, discounted such evidence as CVEC presented on those questions. The Commission explicitly found that CVEC had not sustained its burden of going forward with the evidence on the second issue when it stated, "Furthermore, Central Virginia has not persuaded this Commission that a liberalization of the present policy will result in a significant weakening of financial strength and the necessity for increased rates."

Having found that the present policy was unreasonable and and that it should be changed to afford more reasonable access to the facilities, the Commission proceeded to set "guidelines" for a new policy. Again, this was a proper exercise of legislative discretion. It noted CVEC had been "given ample opportunity in the past to rewrite" its policy but, while making "minor modifications," had refused to make "any substantial changes." The Commission, contrary to CVEC's contention, was not required to present additional evidence and prove that each element of the new policy would not adversely affect the cooperative or its existing customers. Should experience demonstrate the new policy imposes unreasonable burdens, it may, upon application to the Commission, be modified or appropriate rate relief can be ordered. There is nothing irrevocable about the policy set in this proceeding because rates and charges are never permanently

fixed, and are always subject to revision. *Chesapeake and Potomac Telephone Co.* v. *Commonwealth,* 147 Va. 43, 88, 136 S.E. 575, 588 (1927).

 Finally, we reject CVEC's contentions it was given no notice "of the nature and extent of any changes that would be considered if the policy were found to be unreasonable" and it should have been "given an opportunity to propose a new policy." The Rule specifically advised that a change in the existing policy was to be considered. Moreover, the Staff's evidence offered at the first hearing, held almost three months before CVEC's case was presented during the second hearing, showed that seven cooperatives in this State had free extension policies and addressed the details of alternative line extension policies used by other Virginia cooperatives. Indeed, CVEC offered evidence that "free" extension service was inappropriate for the cooperative. In fact, the new policy adopted for CVEC includes many of the elements employed by other cooperatives, as shown by the evidence. This legislative proceeding involved an investigation of the extension policy and charges of an electric utility which were to be applied to the public generally. Given the non-adjudicative nature of the matter, we hold CVEC had ample notice that a changed policy would be considered and that it had adequate opportunity to present evidence and be heard on the contents of a revised extension policy. *See American Bankers Life Assurance Co.* v. *Division of Consumer Counsel,* 220 Va. 773, 785-91, 263 S.E.2d 867, 873-77 (1980).

In sum, we find no abuse of the Commission's legislative discretion and the order appealed from will be

*Affirmed.*