PUBLIC SERVICE COMPANY OF OKLAHOMA, Appellant,

v.

OKLAHOMA CORPORATION COMMISSION, Appellee,

v.

The COALITION FOR FAIR UTILITY RATES, INC., and Neighbor for Neighbor, Inc., Cross-Appellants,

v.

NATIONAL ELECTRIC CONTRACTORS ASSOCIATION, INC., Eastern Oklahoma Chapter, and Lease Lights, Inc., et al., Counter-Appellants.

Nos. 55320, 55346 and 55354.

Supreme Court of Oklahoma

Dec. 27, 1983.

As Corrected Oct. 1, 1984.

Rehearings Denied Oct. 2, 1984.

Doerner, Stuart, Saunders, Daniel & Anderson by Dickson M. Saunders, Dallas E. Ferguson, William H. Hinkle and Everett L. Cunningham, Tulsa, for appellant, Public Service Co. of Oklahoma.

Robert D. Stewart, Jr., General Counsel, Eddie M. Pope, Appellate Counsel, Pat Shore, Asst. General Counsel, Oklahoma City, for appellee, Oklahoma Corp. Com'n.

Andrew T. Dalton, Jr., Tulsa, for cross-appellant, Coalition For Fair Utility Rates, Inc.

Louis Bullock, Tulsa, for cross-appellant, Neighbor For Neighbor, Inc.

Nichols & Wolfe, Inc. by Gerald G. Stamper and Brian W. Huckabee, Tulsa, for counter-appellant, National Electric Contractors Asso., Inc.

Gaither & Gaither by Jack I. Gaither and Bruce Darrow Gaither, Tulsa, for counter-appellant, Lease Lights, Inc., et al.

DOOLIN, Justice:

Public Service Company (PSO), a Tulsa-based public utility, applied to the Corporation Commission for a $29 million rate increase. Following hearings at which several parties intervened, the Commission issued order No. 168923 from which PSO and the intervenors appeal.

## I

The initial issue to be addressed is the timing of the PSO appeal itself. The Commission order granting the increase was handed down May 7, with stipulation that it shall be stayed "for thirty (30) days or until further order of the Commission ...." PSO filed its appeal June 2, inside the 30-day stay. The Coalition for Fair Utility Rates, Inc. (Coalition) argues there was no final appealable order on June 2, and therefore the PSO petition is fatally defective, and should be dismissed.

Earlier in its order the Commission explained its stay as follows: "It is, therefore, the finding of the Commission that the effect of this order should be stayed and the applicant given 30 days to show cause, if any, why new rates should not be implemented as ordered herein."

■ It is obvious from a reading of the order that the "stay" was given to grant PSO time to submit a new rate increase application and ask that it take precedent over the rate structure approved by the Commission. That PSO chose not to take advantage of those thirty (30) days, does not render the initial order a nonfinal, nonappealable order. See our order of September 8, 1980, where we denied Coalition's motion to dismiss PSO's appeal on the same grounds. The Corporation Commission is not authorized to extend appeal time by postponing the effective day of its final order.

## II

In its initial proposition of error, PSO compalins of the manner in which Commission treated its Northeastern generating plant No. 3. PSO used as a test year the twelve months ending June 30, 1979. No. 3 came on line six months later, shortly before the rate hearing began. PSO says it was forced to include all construction costs of No. 3 in the category of Construction Work in Progress (CWIP). However, PSO wanted to include all of these costs in its rate base because No. 3 was completed within twelve months of the test year. The Commission refused that method of calculation and instead authorized 19.1% of the CWIP to the rate base. PSO argues that as error.

The Commission said it would refuse to allow CWIP to be included in a rate base unless it had approved the construction plans.

PSO admits in its brief that "... CWIP traditionally has not been constitutionally required to be included in the rate base," but argues that case law shows that construction completed and operating before commencement of the *rate hearing*, regardless of the stage of completion during the test year, must be fully considered in establishing the utility's rate base.

PSO further admits that No. 3 was included as CWIP in its application, but only because it was forced by statute to file for a rate investigation at that time. If not for the mandate of 17 O.S. 1981, § 263, PSO said it would have waited the six months until No. 3 was completed and on line, so as to include all of No. 3's costs in its rate base.

PSO argues that the Commission has no authority to control internal business deci-

sions, and it is in effect doing that by refusing to approve construction costs in a rate base unless it first approved the construction plan itself.

In *Oklahoma Gas & Electric Co. v. Corporation Commission*, 543 P.2d 546 (Okla. 1975), we said:

"... the Corporation Commission is vested with the power to regulate and supervise the operation, management and conduct of the business of utilities under its jurisdiction, insofar as its public duties and obligations are concerned, but *does not empower the Commission with such powers concerning the internal operations and management* of such utilities to the extent that the Corporation Commission has the authority to prohibit the construction of the proposed project by O G & E." (Emphasis added).

In the above cited case, we also quoted with approval a passage from *Lone Star Gas Co. v. Corporation Commission*, 170 Okla. 292, 39 P.2d 547 (Okl.1934):

"To give an illustration of what we mean. The Commission had no power to prohibit the unification of the companies involved herein, and has no power to dissolve their relationship. It had no power of inspection or approval of the contracts between the companies. But now that such contracts are made and are put forward as establishing certain rights upon the part of the contracting parties, *the Commission may ascertain their effect upon the public rights and approve, modify, or reject such effect*, if found to be unreasonable, unfair, or prejudicial." (Emphasis added).

 As applied to the case before us, the Commission has no power to demand prior approval of construction plans for a new plant, but once it is built, the Commission is empowered to ascertain its effect upon the public rates. That is precisely what the Commission did here. It attempt-

ed to calculate the use by test year and customers of the increased capacity, and arrived at the 19.1% figure,[1] and so allowed 19.1% of the costs as CWIP in the rate base. Neither the Commission, nor PSO, nor for that matter either of the intervenors, can cite Oklahoma authority governing this type of utility rate application procedure. They do, however, point to other states which have handled it.

PSO cites two cases which are distinguished. In *Kansas Gas & Electric Co. v. State Corporation Commission*, 218 Kan. 670, 544 P.2d 1396 (1976), there is no indication why the Kansas Commission initially authorized only two-thirds of the cost of a new generating plant to be added to the rate base. Two months later it granted the other one-third. The court found the two-thirds/one-third designation arbitrary and without authorization of law. There is an indication the Commission determined the plant was only partially used and required to meet demands.

A similar case, also cited by PSO, is *Latourneau, et al. v. Citizens Util. Co.*, 125 Vt. 38, 209 A.2d 307 (1965), cited in *Kansas Gas*, supra. The Vermont Commission granted only fifty percent of the cost of a new plant to be included in the rate base because it determined that only fifty percent of its capacity could be presently used. The Vermont court, in allowing 100 percent of the construction costs (CWIP) in the rate base, said it "recognizes that business judgment must be employed to anticipate future needs and that this judgment cannot be arbitrarily interfered with."

Neither the Kansas nor the Vermont case notes whether its plant was on line during the test year. Such is not the case here as No. 3 was not *completed*, much less *on line*, when the rate increase application was made.

More on point with our fact situation is *Re Arizona Pub. Service Co.*, 20 PUR 4th

---

**1.** Annual capacity (2,365,200 megawatt-hours) divided by estimated increased usage of on-line customers at year's end (451,799 megawatt-hours) equals 19.1%.

253 (Ariz. Corporation Commission, 1977). There, the indication was that the generating plant in question was still under construction when Arizona Public Service Commission sought to have all CWIP placed in the rate base. The Arizona Corporation Commission allowed one-half of CWIP to be included in the rate base. We find no error in the Commission's treatment of No. 3.

### III

▮ PSO's next proposition alleges the Commission erred by failing to approve its proposed method for allocation of profits from nonfirm off-system sales during the test year. PSO sought permission to share off-system profits with its ratepayers on a 90–10 basis, as opposed to giving 100% of the profits to ratepayers as presently in practice. PSO urged that allowing it 10% of the profits would act as an incentive to maximizing those off-system sales profits, and thus benefit its ratepayers by lower rates. Instead the Commission continued its practice of setting a minimum for off-system sales which PSO must meet under penalty of decreased corporate profits.

PSO urges neither case law nor statute citation in support of this proposition error, arguing simply that the Commission "should" have taken the recommended action. It states that the test year of 1978 produced a higher than usual amount of off-system sales due to a coal strike and the unusually severe winter throughout the country. It argues it should not be held to reach that level every year simply because it occurred in a test year. In effect, PSO wants to "normalize" test year off-system sales.

The Commission points out that this Court usually does not entertain propositions of error which are unsupported by authority. *Peters v. Golden Oil Company*, 600 P.2d 330 (Okl.1979).

It acknowledges that a public utility should be encouraged to make and increase off-system sales of excess power when it states, "The more profit PSO can make off-system, the less money it needs from system ratepayers." To accomplish this "encouragement," the Commission has established a "negative" incentive in the form of a "normal" level of off-system sales; the company either makes that normal level or its revenue requirement is reduced accordingly. Once the "normal" level is set, it is compared periodically with the test year level, and adjusted. PSO would rather have the level determined by an average of the past few year's sales; the Commission rejected the recommendation in favor of the status quo. The Commission even rejected its own staff's recommendation for a method to establish a new "normal." The principal witness on this issue, whom PSO attempted to discredit, stated the extreme difficulty in arriving at a "normal" because you cannot assume that all the data used is equally important; he contended more recent data should be given more weight than older data.

The Commission apparently used great care in analyzing the various projection methods and concluded that the actual level of off-system sales was normal and required no normalizing adjustment. We can find no error in its decision, as it is supported by substantial evidence, Oklahoma Constitution, Art. IX, § 20.

### IV

▮ PSO finally argues that the Commission incorrectly calculated its revenue requirement and then refused to correct the figures. The errors include: a mathematical mistake by the Commission staff in calculating PSO's expense for fuel; a double deduction of impermissible lobbying expenses; and using a witness' figure rather than actual figures in calculating off-system unit and firm sales. PSO contends these errors, coupled with adjustments for income tax, resulted in a rate reduction over $5 million more than the Commission intended. An application for a *nunc pro*

*tunc* order was filed but rejected by the Commission, apparently on grounds the appeal had been filed and therefore it had no authority to act.

PSO argues Rule 1.24(a) (12 O.S. Ch. 15, App. 2, "Rules of Appellate Procedure in Civil Cases") permit the Commission to correct the record. The rule in question reads:

"(a) Controversy over correctness of transcript issues involving the correctness of the transcript or of other materials to be included in the record shall be resolved by the trial court, if the dispute should arise before the record is transmitted to this court. If the dispute should arrive after transmission of the record, this court shall designate the mode of proceedings to resolve the issue."

As the record had not yet been transmitted to this court, PSO argues the Commission should have granted its application *nunc pro tunc* and corrected the record as it stood. The Commission failed to brief this proposition of error. However, the intervenor, the Coalition for Fair Utility Rates, argues the corrections sought were substantive, not clerical, in nature, and thus are not permitted under a *nunc pro tunc* application.

PSO cites *Custom Equipment Co. v. Young,* 564 P.2d 1020 (Okl.App.1976), for the proposition that the trial court may correct typographical errors and clerical errors, especially those which cause the record to inaccurately reflect the order of the court. *Central Oklahoma Freight Lines, Inc. v. Corporation Commission,* 484 P.2d 877 (Okl.1971), permits the Commission to make these type of corrections in a *nunc pro tunc* hearing.

We see a distinction. Errors made in transferring a court's "finding" into a written order may indeed be corrected as the cases hold. But a mistake by a staff member, when there is no error between the "findings" and the written memorialization of those findings in the order, is a different matter. There has been no finding by the Commission that the staff errors were indeed mistakes. We find this proposition without merit.

V

We turn to the cross-appeal filed by intervenors Coalition and Neighbor for Neighbor, Inc.

The base issue here is attorney fees. Coalition argues the Commission erred when it refused to award it attorney fees for the intervention action.

Commission ruled it lacked the authority to award such fees. Coalition counters that the authority exists under federal law, specifically The Public Utilities Regulatory Policies Act (Act) (16 U.S.C. § 2601, et seq., particularly sections 2631–33).

The specific mandate under Act is found at section 2632(a):

"... [I]f an electric consumer of an electric utility *substantially contributed to the approval, in whole or in part,* of a position advocated by such consumer in a proceeding concerning such utility ... such utility shall be liable to compensate such consumer ... for reasonable attorney fees ..." (Emphasis added).

The law goes further to give the consumer the right to collect such fees by bringing a civil action in any state court of competent jurisdiction, *unless* the state regulatory commission has adopted its own such procedure.

The Commission finds no fault with Coalition's right of access to attorney fees and costs; the dispute centers on which agency or court has the authority to award such fees and costs. The wording of the Act seems clear: intervenors may bring a civil action in state court for reasonable attorney fees.

Commission notes prior caselaw in which we specifically deny its authority to set attorney fees. *Smith v. Corporation*

*Commission,* 101 Okl. 254, 225 P. 708 (Okl. 1934). In *Lear Petroleum Co. v. Seneca Oil Co.,* 590 P.2d 670 (Okl.1979), Commission was denied authority to enter a money judgment against any party.

Although the Commission made no decision that intervenors in the case at bar were entitled to collect fees and costs, it offers legal theories for its authority to do so.

It cites *Stumpf v. Katschor,* 637 P.2d 855 (Okl.1981), for the proposition that attorney fees can be awarded when a successful litigant has conferred a substantial benefit upon a class of persons. The case, however, refers only to district courts, not the Commission.

As its main sword, Commission brings to our attention 17 O.S. 1981, § 34.1 which empowers the Commission to "implement and administer the Public Utility Regulatory Policies Act ... the Corporation shall adopt such rules and regulations as are necessary to implement the purpose of all federal laws which are administered or enforced by the Corporation Commission." It suggests those new powers—to implement and administer the Act—could be construed to authorize it to grant attorney fees.

▆ Taken together, we agree with the Commission's argument: the Act [section 2632(a)(2)] authorizes the Commission to determine and award attorney fees once it adopts a procedure for accomplishing same. The authority to do just that—adopt such a procedure—comes from the language of section 34.1 (above). However, section 34.1 became effective June 30, 1981, well after the Commission hearing in the instant case. Therefore it cannot apply to the instant case. Coalition's only remedy—if any—is through the court system. It is not decided whether the *federal* act did annoint *state* courts with authority to act, under the circumstances of this case.

## VI

▆ We are next asked to address Commission's inclusion into the rate base of PSO's investment in sodium and mercury vapor outdoor lighting. Evidence indicates PSO is in the business of furnishing illumination to commercial and industrial customers for a flat monthly fee. It provides and installs the poles, lamps, wires, controls, electricity and maintenance. Cross-appellants Lease Lights and others provide the identical service, and they appeal from the decision by Commission to include PSO's investment in said lights in PSO's rate base, thus guaranteeing it a rate of return on the business. The issue is not whether PSO has the right to carry on such a business; that is conceded by the opponents. The issue is whether PSO's investment in that business may be included in its rate base for all the ratepayers to bear. We answer in the negative.

The argument revolves substantially around *jurisdiction* of Commission to even deal with PSO's investment in the lighting business.

Lease Lights, a direct competitor of PSO's lighting business, says Commission should disallow expenditures for ratemaking purposes "unless the utility establishes such expenditure is demonstrated to be beneficial to *all* consumers." *State v. Oklahoma Gas & Electric,* 536 P.2d 887 (Okl.1975). (Emphasis added). It said PSO offered no evidence to justify including the investment in the rate base, which was its legal burden of proof.

National Electrical Contractors Association, Inc. (NECA), a counter-appellant, contends PSO is authorized to include in its rate base only equipment and plants used for the production, transmission, delivery and furnishing of electric power, citing 17 O.S. 1981, § 151, the statutory definition of a "public utility." It argues that a public utility's rate base should include only those items which are used and useful to the utility's *public* service, not its *private* business. Its brief quotes from part of the dissent filed by Commissioner Bill Dawson:

"It seems to this Commissioner that it is not only unlawful but inequitable and

unjust for a public utility to impose upon the general ratepayers the cost of outdoor lighting which is utilized by a ratively small percentage of the customers (mostly commercial customers) who want the service, when a vast majority of the ratepayers have no desire for the service. The same outdoor-lighting service, at lease for commercial and industrial users, appears to be available through private contractors on a competitive basis without the imposition of unjust cost upon the general ratepayers.

If a public utility can provide appliances to furnish illumination or lighting and include the investment and operation of such installations in its rate base, it could provide all appliances merely because they are operated by electricity. It could provide and include in its rate base all heating and air-conditioning systems, both residential and commercial. It could install, provide and include in its rate base all building elevators and all manner of electric motors and electrically-powered equipment. The natural result of such reasoning would be that a water utility could install and include in its rate base a bathtub in every residence, merely because it is supplied by water which the utility is authorized to furnish under its rate structure."

Finally NECA argues, as do the other intervenors, that the decision by the Commission to include outlighting expenses in PSO's rate base is not supported by substantial evidence. PSO answers that intervenors did not question the inclusion during the hearing, and only brought it to Commission's attention via brief after the close of the hearing. It argues that absent notice it should not be required to account for every item to be included in the rate base. See *Central Maine Power Co. v. Maine Public Utilities Commission*, 405 A.2d 153 (Me.1979) which involved land held for future use and investment in joint corporate projects accounts. In fact, PSO admits "there is thus almost no evidentiary record on the subject" because it was not challenged before the Commission.

PSO argues that its area lighting service is as much a "public service" as its conservation and research programs and expenses for its general offices and home energy audits. It fails to note, however, that all the later categories do in fact serve the public as a whole, while its area lighting program serves only a very small proportion of the public. In other words, PSO would have *all* its ratepayers pay for a service utilized by a very few ratepayers.

Parties note Commission may exclude unnecessary items of cost. As example, the Commission may exclude certain promotional expenses if they are "excessive, unwarranted, unreasonable, or incurred in bad faith." See *State v. Oklahoma Gas & Electric Co.*, supra. Both parties note the case of *Virginia Electric Power Co. v. State Corporation Commission*, 219 Va. 894, 252 S.E.2d 333 (1979), in which the Commission excluded investment in outdoor area lighting from the company's rate base as "not devoted to the use and accommodation of the public," and such decision was upheld by the Virginia Court. The Virginia Court said the Commission had the authority to determine the public duties of the Company.

We hold that a business such as area outdoor lighting is a separate venture of PSO, is not used or useful to the ratepayers as a whole, and thus its investment may not be included in its general rate base. It is similar in nature to the selling of appliances (which are improper under 18 O.S. 1971, § 1.27). See *State v. Oklahoma Gas & Electric*, supra.

## VII

Coalition attacks the Commission order granting PSO a rate of return of 15% on common equity (10.68% rate of return). Coalition argues the rate was not supported by substantial evidence.

■ PSO questions a new reviewing test for Commission cases that we adopted in *El Paso Natural Gas v. Corporation*

*Commission,* 640 P.2d 1336 (Okl.1982). *El Paso,* in effect, took the rule from the Supreme Court case of *Universal Camera Corporation v. National Labor Relations Board,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The rule states, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." We emphasize that we are not reweighing all the evidence before the Commission. We are simply determining whether the Commission's order was supported by "substantial evidence," as mandated by Oklahoma Constitution, Art. 9, § 20.

A 15% plus rate was suggested by the Company witness. The Commission staff expert recommended a rate of 13.75%–14%, while the Neighbor For Neighbor expert said a rate of 12%–13.25% was more in line with his analysis of the company's financial situation.

Coalition fails to support its contention, other than a bald assertion that PSO's financial witness "made no analysis whatsoever."

Perhaps the succeeding paragraph from *Universal Camera,* 71 S.Ct. at 465, will clarify our standard of review:

"To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.* Congress has merely made it

clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

 We cannot, and will not, reweigh the evidence as in a trial *de novo.* We must simply ascertain that the decisions of the Commission are adequately supported by substantial evidence, and as part-and-parcel thereof, we will consider evidence opposed to the Commission's view.

 In regard to the issue of rate of return, the Commission had the benefit of financial analysis from three experts. It chose to grant a rate of return more in line with PSO's expert, Carl Seligson, Managing Director, Merrill, Lynch, Pierce, Fenner & Smith. Even then, Seligson had recommended a rate of return of "at least 15%." The Commission is under no set rule or formula, for ratemaking is not an exact science; *Application of Arkansas Louisiana Gas Company,* 558 P.2d 376 (Okl. 1976). We find Commission's order is supported by substantial evidence.

AFFIRMED IN PART, REVERSED IN PART, CAUSE REMANDED TO ENTER ORDER CONSISTENT WITH THE VIEWS EXPRESSED HEREIN, INCLUDING CONSIDERATION OF SUBSTANCE ERROR AS TO CALCULATION, IF ANY, AS DISCUSSED IN PART IV HEREOF.

SIMMS, V.C.J., HARGRAVE, J., and ROBINSON, S.J., concur.

BARNES, C.J., and LAVENDER, J., concur in Parts I, II, III, IV, V and VII and dissent from Part VI.

HODGES, J., concurs in all parts except dissents to Part V.

OPALA, J., concurring in Parts I, III, IV, VII; dissents from Parts II, V, VI.